*IN THE UNITED STATES DISTRICT COURT*
*FOR THE NORTHERN DISTRICT OF GEORGIA*
*ATLANTA DIVISION*

| | |
|---|---|
| *UNITED STATES OF AMERICA,* | |
| | *CRIMINAL FILE NO.* |
| *v.* | *1:05-CR-67-CC* |
| *RAMON OSEGUERA-ALANIS,* *IGNACIO CORTES-VALENCIA,* *and GUSTAVO LARA MURILLO,* | |
| *Defendants.* | |

### *ORDER, REPORT AND RECOMMENDATION*

Pending before the court are the defendants' motions to suppress evidence and statements. (Docs. 25, 27, 41, 71, 72, 73). Hearings on these motions were held before the undersigned magistrate judge on April 22, 2005, and June 22, 2005. Transcript references to each hearing are designated as (4/22/05 Tr.) or (6/22/05 Tr.). For reasons discussed below, the undersigned ***RECOMMENDS*** that defendants' motions to suppress evidence be ***DENIED***, and that defendants' motions to suppress statements be ***GRANTED IN PART*** and ***DENIED IN PART***. The non-dispositive motions are addressed in the conclusion below.

## *I.  FACTS*

In September 2004, agents of the Drug Enforcement Administration ("DEA") arrested Jorge Quintero at a residence located at 200 Church Road, Smyrna, Georgia (referred to as "the Church Road residence").  During a search of that residence, agents seized drugs and guns. (4/22/05 Tr. at 77; 6/22/05 Tr. at 22).  The names of the three defendants in the instant case had not come up during the Quintero investigation. (6/22/05 Tr. at 50-51).

In December 2004 or January 2005, a DEA Confidential Source ("CS") told DEA Special Agents Keith Cromer and Lourdes Bowen that Santiago Cortes, a methamphetamine distributor who had worked with Quintero, was residing at the Church Road residence. (4/22/05 Tr. at 78; 6/22/05 Tr. at 23).  The CS further said that the new tenants of the Church Road residence paid rent to the landlord at an off-site location and did not want the landlord to enter the residence.  (6/22/05 Tr. at 23, 52).

During the same time period, officers working with the Marietta-Cobb-Smyrna ("MCS") Drug Task Force told DEA Special Agent Robert Murphy that employees working at two different hardware stores in Smyrna, Georgia, had called a hotline to report suspicious activities at their stores. (6/22/05 Tr. at 14-15, 46-47).  The hardware

2

store employees reported that on three separate occasions, Hispanic males purchased the entire stocks of Red Devil Lye, muriatic acid, and acetone that were on the shelves of their stores. (6/22/05 Tr. at 14-15, 20, 38, 46).  They also reported that on all three occasions the purchasers left the stores driving a gold-colored BMW with Georgia license plate ARG 3920; the latest such purchase occurred on January 21, 2005. (6/22/05 Tr. at 15, 40).

Special Agent Murphy had significant training and experience in the investigation of the manufacture of methamphetamine.  Another special agent in his group had been designated as a laboratory specialist and had received specialized training in the manufacturing and reprocessing of methamphetamine.  (6/22/05 Tr. at 16-18).  Based on his training and his debriefing of others concerning the manufacture of methamphetamine, Agent Murphy believed that the purchase of the hardware stores' entire supplies of these three chemicals was indicative of the manufacture of methamphetamine.  (6/22/05 Tr. at 20).  Agent Murphy did not know the quantity of the chemicals that had been purchased or the identity of the purchasers.  DEA Agents determined that the two hardware stores that reported the purchases were located in the same area as the Church Road residence in Smyrna.  (6/22/05 Tr. at 14).

In January 2005, a separate source of information ("SOI"), who was familiar with the neighborhood surrounding the Church Road residence, began providing information to DEA Special Agents Jim Stearns and Lourdes Bowen. (6/22/05 Tr. at 24-25). Specifically, on January 19, 2005, the SOI told Special Agent Bowen that he/she had observed a gold BMW, license plate number ARG 3920, arriving at and leaving from the Church Road residence at all hours of the day and night and that there were no lights on in the residence even though people were entering and leaving. (4/22/05 Tr. at 79-80; 6/22/05 Tr. at 25).

On February 9, 2005, another source of information ("SOI 2") told Special Agent Bowen that he/she saw the same gold BMW parked in the carport of the Church Road residence and had smelled a strong odor of acetone coming from the residence. (4/22/05 Tr. at 81; 6/22/05 Tr. at 27, 59). The odor of acetone is given off in the manufacturing of methamphetamine and in the reprocessing of methamphetamine into ice methamphetamine. (6/22/05 Tr. at 31).

On that day, several DEA Agents set up surveillance at the Church Road residence. They observed that the gold-colored BMW, which had previously been identified by the hardware store employees and the SOIs, was parked in the carport of the residence. (4/22/05 Tr. at 22; 6/22/05 Tr. at 27-28).

4

At about 10:00 p.m. on February 9, 2005, Special Agent Chris Daniel, one of the surveillance agents, noticed that the garage door, located at the rear of the residence, was cracked open about 12 inches and a light was on inside the garage. The garage was connected to the basement, which had a separate door to the rear of the house. He saw people moving around in the basement and shadows that suggested that people were also moving around in the garage. (4/22/05 Tr. at 16-17, 19-20, 58). At about 10:40 p.m., Special Agent Daniel saw defendant Oseguera exit the basement door into the backyard of the residence. Oseguera carried a container approximately the size of a 55-gallon trash can. Immediately afterwards, defendants Lara and Cortes exited the same door to the backyard. Oseguera dumped liquid from the container onto the ground of the backyard, after which all three defendants reentered the basement and closed the door behind them. (4/22/05 Tr. at 20-22).

Based on his training and experience, Special Agent Daniel knew that the process of manufacturing methamphetamine generates fumes and liquid byproducts. He believed that the partially open garage door was consistent with the venting of fumes and that the act of pouring out a large container of liquid into the yard was consistent with the disposal of liquid byproducts from the manufacture of methamphetamine. (4/22/05 Tr. at 31-33).

5

Approximately ten minutes after pouring out the liquid in the backyard, Oseguera and Cortes exited the house. (4/22/05 Tr. at 23). Cortes approached the gold BMW parked in the carport, opened the front passenger door, knelt down, and appeared to occupy himself with something at the floorboard of the vehicle. (4/22/05 Tr. at 28). At about the same time, Agent Murphy heard on the radio that Cortes carried something with him to the gold BMW and placed it in the front passenger area of the vehicle. (6/22/05 Tr. at 89-91). Cortes and Oseguera reentered the residence, and several minutes later all three defendants exited the house and entered the gold BMW. (4/22/05 Tr. at 29).

Agents saw the headlights of the BMW come on. They decided to approach the BMW and detain the three defendants pending additional investigation. (6/22/05 Tr. at 29; 4/22/05 Tr. at 30, 84). As they approached the driveway, Agent Daniel smelled a strong odor of acetone which he had previously smelled in other methamphetamine laboratories. (4/22/05 Tr. at 33, 51).

Three agents, Daniel, McCrorey, and Stearns, blocked the BMW as it was leaving, approached it with their guns drawn, ordered the defendants out of the car, and placed them in handcuffs on the ground. Agents Bowen and Murphy arrived independently, several minutes after the first three agents, and, as they approached the house, they each

smelled a strong odor of acetone coming from the residence. (4/22/05 Tr. at 91; 6/22/05 Tr. at 30).

After the officers removed the defendants from the gold BMW, Agent Bowen asked all three defendants who owned the house and who was living there. All three defendants denied living in the house and denied having any knowledge of who owned it. In addition, all three defendants denied ownership of the gold BMW. (4/22/05 Tr. at 86, 88; 6/22/05 Tr. at 32-33). Agent Bowen also asked Oseguera if he had a key to the residence, and Oseguera replied that a key was somewhere in the area. Agent Bowen then found a key to the carport door on Oseguera's person after performing a pat- down search. (4/22/05 Tr. at 89; 6/22/05 Tr. at 35).

At approximately 11:00 p.m., a few minutes after the defendants were handcuffed, Agent Murphy looked through the windshield of the gold BMW and noticed a plastic bag protruding from underneath the front passenger seat. He entered the BMW, retrieved the plastic bag, opened it, and found a package containing a pound of ice methamphetamine. (4/22/05 Tr. at 37; 6/22/05 Tr. at 35-36).

While agents were conducting their surveillance of the residence, two other officers involved in the investigation prepared and presented a search warrant application for the Church Road residence to a Cobb County Judge.

The affidavit in support of the search warrant provided the following facts:

(1) On September 22, 2004, DEA agents arrested Jorge Quintero at the Church Road Residence. Agents earlier had identified Quintero as a distributor of multi-kilogram quantities of cocaine, marijuana, and methamphetamine in the Atlanta area. After arresting Quintero, agents searched the Church Road Residence and seized approximately 200 pounds of marijuana and two firearms. (Govt.'s Ex. 2 at ¶ 5).

(2) A confidential informant ("CS"), who has provided reliable information to DEA agents in the past and whose information had been corroborated through investigation, told DEA that Santiago Cortes may be residing at the Church Road Residence. The CS said that Cortes was a distributor of methamphetamine and an associate of Quintero. The CS said that Cortes was driving a gold BMW. (Id. at ¶ 6).

(3) On January 19, 2005, a source of information ("SOI") told DEA agents that the occupant of the Church Road Residence was a Hispanic male who drove a gold BMW with Georgia license plate number ARG3920. The SOI said that he saw vehicles arriving at the Church Road Residence at various times of the day or night, and that the lights to the residence were not on. TFA Kite stated that, based on his training and experience, he found these facts to be suspicious because they are consistent with the ways that drug traffickers use a stash house to store, process, package, and distribute drugs. (Id. at ¶ 7).

(4) On February 9, 2005, the SOI contacted the DEA agents and reported that the SOI smelled an odor of acetone, and a burning smell, coming from the Church Road Residence when the SOI was near the residence. The SOI also reported that he/she saw lights on in the garage and the rear garage door was partially open, and that there were people inside the residence. (Id. at ¶ 8).

(5) At approximately 10:00 p.m. on February 9, 2005, DEA Special Agent Chris Daniel saw that the rear garage door of the Church Road Residence

8

> was partially open, that the lights were on inside the garage, and people were moving inside the residence. (Id. at ¶ 10).
>
> (6) At approximately 10:45 p.m. on February 9, 2005, DEA agents saw a male remove a container from the Church Road Residence, take it into the back yard, and pour an unknown liquid from the container onto the ground. (Id. at 9).
>
> (7) Shortly after 10:45 p.m., agents stopped the gold BMW as it began to leave the Church Road Residence, and identified three occupants. The agents then seized approximately one pound of suspected ice methamphetamine from the front passenger floor area of the BMW. (Id.).

The judge signed the warrant at 11:30 p.m., after which the agents entered the residence and conducted the search. While the search of the residence was being conducted, the defendants remained in handcuffs. At some point, the defendants were moved away from the immediate vicinity of the house.

At about midnight, Agent Bowen, who speaks Spanish, approached defendant Oseguera. (4/22/05 Tr. at 92-94). Agent Bowen gave him Miranda warnings in Spanish by reading them from a DEA card. (4/22/05 Tr. at 95, 116). Oseguera said that he understood his rights and consented to an interview. (4/22/05 Tr. at 96).

Special Agent David Wolff approached defendant Cortes while Cortes was handcuffed in the back of Agent Wolff's car. Cortes speaks only Spanish. Agent Wolff is not a native Spanish speaker but is trained in, and able to converse in, Spanish. He

learned Spanish through a six month Spanish language course and by working for DEA in Spanish speaking countries. (6/22/05 Tr. at 96-97). Before questioning defendant Cortes, Agent Wolff advised him of his Miranda rights in Spanish by reading them from a DEA card. (6/22/05 Tr. at 100-01, 104; Govt.'s Ex. 3). With the exception of some minor and inconsequential differences, the Spanish portion of the card says the same thing as the English portion of the card. Both versions contain the essential elements of the Miranda warnings. (See Govt.'s Ex. 3). Cortes told Agent Wolff that he understood his rights and agreed to waive them and answer his questions. (6/22/05 Tr. at 102, 115).

## II. DISCUSSION

### A. Probable Cause to Arrest

The government argues that the initial stop and detention of the defendants was an investigative detention and that defendants were not arrested until after the methamphetamine was found in the gold BMW. An investigative detention requires only reasonable suspicion, whereas an arrest requires probable cause. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed. 2d 889 (1968). The government also argues that there was probable cause for an arrest even before the methamphetamine was found in the car.

Because the court finds that there was probable cause to arrest the defendants even before the methamphetamine was found in the car, the court need not determine whether the initial detention of the defendants rose to the level of an arrest. The court will assume, without deciding, that the defendants were arrested when they were removed from their car and handcuffed.

Warrantless arrests for felonies are lawful if the police have probable cause to believe that the person to be arrested has committed or is committing a crime. See United States v. Watson, 423 U.S. 411, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976). Probable cause to conduct a warrantless arrest exists when law enforcement agents have, at the moment of arrest, knowledge of facts and circumstances grounded in reasonably trustworthy information and sufficient in itself to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested. Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225 13 L.Ed.2d 142 (1964).

In this case, as set forth above, the officers had been informed of, or knew, the following facts prior to arresting the defendants:

- On three separate occasions, the last of which was January 21, 2005, Hispanic men in the gold BMW purchased two area hardware stores' entire stock of three different substances that are used in the production of methamphetamine;

11

- The gold BMW had been coming and going from the Church Road residence at all hours of the day and night;

- An extremely strong smell of acetone, a substance emitted during the production of methamphetamine, was coming from the Church Road residence. At least one of the officers smelled acetone before the defendants were removed from their vehicle;

- A methamphetamine distributor, associated with a person previously arrested for distributing methamphetamine, was living in the Church Road residence;

- On February 9, 2005, individuals were moving about the garage and basement, and the garage door was partially open as if to vent it;

- One of the defendants, while watched or assisted by the other two defendants, left the basement area to pour a large container of liquid onto the ground in the backyard;

- The residents of the Church Road house did not want the landlord to enter the residence;

- Defendant Cortes left the residence and placed something on the floor of the front passenger area of the BMW; and

12

- All three defendants left the Church Road residence on the night of February 9, 2005, and entered the gold BMW.

This information understandably led the DEA agents, who were experienced in investigations of clandestine methamphetamine laboratories, to conclude that the defendants were engaged in the manufacture of methamphetamine at the Church Road residence. Other courts have found probable cause of methamphetamine production with fewer and less compelling incriminating facts. See United States v. Ryan 293 F.3d 1059, 1061-62 (8th Cir. 2002) (finding probable cause to search house for evidence of manufacture of methamphetamine where strong odor of ether emanated from house; a passerby reported that drugs were in the house; officer knew that odor of ether is given off in manufacture of methamphetamine; and defendant had a history of drug convictions); United States v. Steward, 935 F.2d 277, *2-3 (9th Cir. 1991) (unpublished) (finding probable cause of methamphetamine manufacturing established by odor of acetone and other chemicals associated with methamphetamine manufacturing coming from a residence, along with the fact that the tenant of the residence paid rent in cash and had a criminal record); see also United States v. Ryles, 988 F.2d 13, 14 n.2 (5th Cir. 1993) (noting that it was undisputed on appeal that the officer's smelling of marijuana gave him probable cause to search a van); United States v. Neumann, 183 F.3d 753, 756

13

(8th Cir. 1999) (finding that odor of burnt marijuana gave officer probable cause to search for drugs).

Defendants point to the agents' lack of certain information prior to the arrest of the defendants such as: (1) their lack of information on the quantity of chemicals purchased at hardware stores by the men in the gold BMW or the identity of the purchasers; (2) the absence of a connection of the defendants to the prior investigation of Quintero or to Santiago Cortes; (3) the lack of specifics on, or corroboration of, the three sources who provided some of the information listed above; and (4) the absence of any direct observations of manufacturing activities at the Church Road residence. The court has considered these arguments, and recognizes that each piece of evidence, by itself, may be insufficient proof, or insufficiently corroborated, to justify an arrest; nevertheless, considering the totality of the circumstances, the agents had ample facts, grounded in reasonably trustworthy information, to conclude that the defendants were engaged in the manufacture of methamphetamine.

Because the agents had probable cause to arrest the defendants, they also had probable cause to search their vehicle without a warrant. See United States v. Thornton, 541 U.S. 615, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004) (reaffirming that officers may

conduct a warrantless search of a vehicle's passenger compartment as a contemporaneous incident of arrest).

### B. *Validity of the Search Warrant*

Defendants argue that the affidavit for the search warrant for the Church Road residence failed to establish probable cause, the information was stale, and the affidavit relied upon facts that were obtained pursuant to the illegal arrest of the defendants.

As set forth above, there was probable cause to arrest the defendants before the search warrant was obtained. The affidavit included the information, discussed above, that justified the defendants' arrest. The affidavit included the additional timely fact that shortly before the affidavit was presented, officers found approximately one pound of methamphetamine on the front floorboard of the gold BMW. These facts clearly provided timely probable cause for the search of the residence.

In any event, this case is governed by United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In Leon, the Supreme Court recognized a good faith exception to the exclusionary rule for searches conducted pursuant to warrants. The court held that suppression of evidence would have no deterrent effect when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate

15

and has acted within its scope.  See Leon, 468 U.S. at 922-95, 104 S.Ct at 3420-22. Defendants have not set forth any applicable exception to the Leon rule.  Accordingly, there is no basis for suppression of evidence seized in the search.

### *C.  Statements of Defendants Cortes and Oseguera*

Defendant Oseguera did not file an initial post-hearing brief in support of his motion to suppress statements as directed by the court.  (6/22/05 Tr. at 128). Nevertheless, he argues that he did not abandon this issue because he raised it in his pre-hearing motion to suppress.  The court intended for defendants to file a post-hearing brief if they wished to pursue motions to suppress statements.  Nevertheless, the court will address the admissibility of Oseguera's statements and will not consider the issue abandoned.

As another initial matter, the court notes that the government's brief did not address any statements made by the defendants prior to the time they were given Miranda warnings.  The court directed the government to state specifically which statements it intended to introduce into evidence because some statements had been made before Miranda warnings had been given. (4/22/05 Tr. at 143).  In particular, prior to receiving Miranda warnings, the defendants were asked about, and denied knowledge concerning, the house and car, and defendant Oseguera made a statement about a key.

(4/22/05 Tr. at 86-88; 6/22/05 Tr. at 31-33). The government has not set forth or addressed the admissibility of any pre-Mirandized statements of the defendants. Therefore, the court will assume that the government does not intend to introduce any statements of the defendants prior to the time they were given Miranda warnings.

As to the remaining statements, the government established that defendants Oseguera and Cortes were given Miranda warnings in Spanish and that they voluntarily waived their rights and made statements. The agents did not engage in any inappropriate or coercive conduct in order to obtain the defendants' statements. Accordingly, the defendants' post-Miranda statements should not be suppressed.

### III. CONCLUSION

For the reasons discussed above, the undersigned **RECOMMENDS** that defendants' Motions to Suppress Evidence (Docs. 27, 41, 71, 72) be **DENIED** and that any Motions to Suppress Statements (Docs. 25, 73) be **GRANTED IN PART** and **DENIED IN PART**, specifically, that any statements made by defendants prior to receiving Miranda warnings be suppressed, but that all other statements not be suppressed.

In addition, all pending motions for extensions of time and motions to adopt (Docs. 35, 36, 38, 47, 48, 75, 78) are ***GRANTED***. The motion to limit the scope of the Government's expert witness opinions (Doc. 43) is ***DENIED***, but the issue may be raised at trial as an evidentiary issue before the district judge. The motion for an order compelling the Government to disclose prior bad acts (Doc. 45) is ***DENIED***. The government's obligation with respect to disclosure of Rule 404(b) evidence is covered in the pre-trial order at page 6. The motion for Discovery of Eyewitness Identification Procedures (Doc. 28) is ***DENIED*** because it appears to relate to a different case in which the defendant was accused of committing three bank robberies. In any event, the government has agreed to provide any identification information.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the further scheduling of this case.

***IT IS THEREFORE ORDERED and ADJUDGED*** that this action be, and the same is hereby, declared Ready For Trial.

***SO ORDERED AND RECOMMENDED*** this 9th day of September, 2005.

                                      s/ Gerrilyn G. Brill
                                      GERRILYN G. BRILL
                                      UNITED STATES MAGISTRATE JUDGE